THOMPSON, Judge.
The appellant, LiT Champ Food Stores, Inc., contends that the trial court erred in permitting appellee’s claim for punitive damages to go to the jury, and, further, in denying LiT Champ’s post-trial motions relating to punitive damages and entering judgment pursuant to the jury’s verdict awarding punitive damages. We agree and reverse.
On the night of March 31, 1981, an armed robbery took place at one of appellant’s Jacksonville area convenience stores. Although the robber brandished a sawed-off shotgun with which he threatened the store clerk and another person who was in the store, no shots were fired and no injury occurred in the store. However, after the robber left the store he shot and fatally wounded appellee’s decedent, a customer who, unaware that a robbery was in progress, had just driven her car into the store’s parking lot. While resolution of the issue presented in this appeal does' not require a determination as to precisely how and why this tragic event occurred, we note that it is impossible to determine from the evidence whether the shot which struck the decedent was fired accidently, as the robber subsequently claimed, or whether the robber intentionally fired at the on-coming car, either in a deliberate attempt to eliminate witnesses or because he panicked and mistakenly assumed that the occupants of the car were pursuing him.
In prosecuting this wrongful death action against LiT Champ, the appellee relied on two theories of negligence in support of her claims for compensatory and punitive damages. The first theory involved vicarious liability on the part of LiT Champ, and was predicated upon evidence that the store clerk, acting negligently and in contravention of company policy, picked up the store’s telephone in order to call police pri- or to the time the robber had made a complete getaway, i.e., prior to the time he had left both the store and its parking lot. This theory was based on evidence from which the jury could have inferred that the robber had glanced back into the store through its front windows as he fled, had seen the clerk pick up the telephone, had concluded that the clerk was using the telephone in order to call police, and then had decided to re-enter the store in order to prevent the clerk from telephoning police. Appellee theorized that had the robber not seen the clerk using the telephone, he would have proceeded directly toward his car in order to complete his getaway, and would never have encountered appellee’s decedent as she entered the parking lot.
Even if the evidence that the clerk prematurely picked up the telephone is accepted as sufficient to support a conclusion that the clerk was negligent, this evidence would be patently insufficient to support an award of punitive damages against LiT Champ. Although under certain circumstances an employer may be held vicariously liable for compensatory damages occasioned by the negligent conduct of an employee, the employer cannot be held liable for punitive damages upon a theory of vicarious liability unless it be shown that there was some fault on the part of the employer and that the tortious conduct of the employee actually amounted to willful, wanton, or reckless mis conduct. Mercury Motors Express, Inc. v. Smith, 393 So.2d 545 (Fla.1981). Here, the store clerk’s allegedly negligent act of picking up the telephone “too soon” can by no stretch of the imagination be characterized as willful and wanton misconduct. Therefore, LiT Champ cannot be held liable for punitive damages as a result of the clerk’s allegedly improper conduct, even if LiT Champ could somehow be said to have been at fault in the incident.
The second theory upon which ap-pellee relies in arguing that the award of punitive damages should be sustained is the theory that LiT Champ itself was directly responsible for acts or omissions evidencing such willful and wanton disregard *728 for the rights of others as to subject the company to liability in its own right. The evidence adduced by appellee tending to show direct negligence on the part of Lil’ Champ consisted of the testimony of a security expert called by appellee and of several admissions made by corporate officers of Lil’ Champ. In essence, the testimony of appellee’s expert consisted of conclusions that Lil’ Champ was “grossly negligent” in failing to institute a formal security “program” directed toward prevention of armed robberies at their various stores and that Lil’ Champ had fallen “below minimum dirt-floor standards” in failing to establish a comprehensive robbery prevention program. However, with the exception of a rather equivocal suggestion that Lil’ Champ should have installed silent alarms in its stores so that store clerks could notify police of robberies in progress, the expert pointed to no specific actions which Lil’ Champ might have taken to discourage armed robberies such as the one which resulted in the death of appellee’s decedent. The expert did not testify that the store premises where this robbery occurred could have been made safer by the installation of additional lighting, video monitors, or by the hiring of armed or unarmed guards, etc. He gave no evidence as to any particular course of action Lil’ Champ might have taken to prevent this particular robbery, and, indeed, admitted that no security program, no matter how comprehensive, could be 100 percent effective in preventing robberies or attempted robberies.
The admissions of certain of Lil’ Champ’s corporate officers which the appellees contend proved negligence on the part of Lil’ Champ were to the effect that notwithstanding that the officers knew that armed robberies resulting in injury to employees or customers had occurred in the past and were likely to recur, Lil’ Champ had not hired any security consulting services such as that operated by appellee’s expert witness, and had not instituted the type of formal security program advocated by ap-pellee’s expert. While these “admissions” may tend to show that Lil’ Champ failed to conform to the standard of care espoused by appellee’s expert, they are wholly insufficient to prove willful and wanton disregard by Lil’ Champ of the safety of its employees and customers. Lil’ Champ put on evidence that it did in fact have a robbery prevention program, and its expert witness was of the opinion that its robbery prevention program was reasonable and adequate. There was uncontradicted evidence that Lil’ Champ deliberately locates its stores away from high crime areas, keeps its stores brightly lit at all times, and installs large expanses of glass across the fronts of its stores to create a “fish bowl” effect so that any person attempting to perpetrate a crime within a store will be visible to passersby outside the store. In addition, there was uncontroverted evidence that two of Lil’ Champ’s corporate officers attended crime prevention seminars sponsored by the Duval County Sheriff’s Office during 1979 and 1980, and that Lil’ Champ implemented the anti-robbery suggestions made by the sheriff’s department during these seminars. Finally, there was uncontradicted evidence that Lil’ Champ had prepared and circulated to all its employees a memorandum instructing employees in ways of minimizing armed robberies and in ways of minimizing harm to employees and customers in the event an armed robbery should occur.
Among the suggestions which the sheriff’s office made to the officers of Lil’ Champ and which Lil’ Champ in turn adopted as policy was the suggestion that store clerks be instructed not to resist robbery attempts, but instead to obey the robbers’ demands so as to end the criminal episode quickly, before personal injury to employees or by-standers might occur. Appellants now argue that in instructing its employees to cooperate with armed robbers, Lil’ Champ displayed willful and wanton disregard for the safety of both its employees and its customers. As best as we can determine, this argument is predicated on an inference that by implementing a policy of cooperation with armed robbers, Lil’ Champ actually encouraged or invited the victimization of its various stores by *729 armed criminals. This inference is unreasonable, to say the least.
In our view, the evidence in this case fails to demonstrate even “gross negligence,” much less willful and wanton misconduct of such egregious nature as to support an award of punitive damages. As stated by our Supreme Court in Carraway v. Revell, 116 So.2d 16 (Fla.1959) and, more recently, in White Construction Co., Inc. v. Dupont, 455 So.2d 1026 (Fla.1984), “The character of negligence necessary to sustain a conviction for manslaughter is the same as that required to sustain a recovery for punitive damages.” The evidence in this case was only marginally sufficient to support a finding of simple negligence. It was patently insufficient to support an award of punitive damages. The award of punitive damages is REVERSED.
MILLS and SMITH, JJ„ concur.